IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES ANDERSON et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 16-cv-00726 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| CITY OF CHICAGO et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs James Anderson, Dorothy Whitfield-Anderson, Terrell Whitfield, Janice King, Toyothy Whitfield, and Semaj Henderson-Funchess have sued Defendants City of Chicago and Police Officers Joseph R. Papke, Durand E. Lee, and Brian T. Schnier[1] alleging that Defendants used excessive force, committed battery, and unlawfully seized property by killing a family dog, all while executing a search warrant for the residence located at 6540 South Drexel ("Drexel Residence"). Now before the Court is Defendants' motion for summary judgment on Count VII.[2] (Dkt. No. 50.) For the reasons discussed below, the motion is denied.

---

[1] Plaintiffs originally named six other police officers as Defendants in the Second Amended Complaint ("SAC"). (Dkt. No. 47.) The parties then filed a joint stipulation of dismissal, dismissing all claims against five of the officers (Rico Carter, Patrick J. Wherfel, Erik R. Shearer, Armando Ugarte, and William J. Lepine). (Dkt. No. 85.) That was followed by another joint stipulation of dismissal, dismissing (among other claims) Count VIII—the only claim that appears to have been asserted against the sixth officer, Anthony P. Bruno. (Dkt. No. 92.)

[2] Defendants originally moved to dismiss Counts V, VI, VII, and VIII. But Counts V, VI, and VIII were subsequently voluntarily dismissed by the parties. (Dkt. No. 92.) Therefore, only the portion of the motion relating to Count VII remains before this Court for decision.

# BACKGROUND[3]

On September 4, 2015, police officers executed a search warrant for the Drexel Residence. (Pls.' Resp. to Defs.' Local Rule 56.1(a)(3) Stmt. of Undisputed Facts ("PRDSUF") ¶ 6, Dkt. No. 67.) The warrant targeted an individual by the name of Jeremi Edinborough and authorized a search for crack cocaine and drug paraphernalia. (*Id.* ¶ 7.) That evening, when police officers arrived at the Drexel Residence to execute the warrant, Anderson was sitting on the front porch. (Defs.' Resp. to Pls.' Local Rule 56.1(a)(3) Additional Stmt. of Facts ("DRPASOF") ¶ 5, Dkt. No. 73.) According to Anderson, he shouted at the officers that no one was inside except for two young girls (King and Henderson-Funchess) and his dog. (*Id.* ¶ 7.) Defendants admit that Anderson told the officers about the two girls but deny that they were told about the dog. (*Id.*)

The officers did not ask Anderson to open the doors to the Drexel Residence; instead, the officers were able to open the exterior door without using force and then used a ram to enter the home through the interior door. (PRDSUF ¶¶ 9–13.) Once inside, with Schnier going first and Papke following behind him, Papke faced a 50 to 60-pound, muscular "pit bull." (*Id.* ¶¶ 13–15.) Defendants claim that the dog was about to attack the officers—that the dog had lips curled and teeth exposed, was charging, and was in the air going in Schnier's direction while Papke was also walking into the dog's path. (*Id.* ¶¶ 14, 16–18.) Papke then shot the dog, aiming at the dog's vital organs. (*Id.* ¶ 14; DRPASOF ¶ 13.)

Only King and Henderson-Funchess were inside the Drexel Residence when the officers entered. (PRDSUF ¶ 21.) The two teenaged girls did not see what occurred to cause Papke to shoot the dog. (*Id.* ¶ 23.) But Henderson-Funchess claims that she heard the police knocking,

---

[3] Plaintiffs and Defendants disagree about much of what happened at the Drexel Residence on the evening of September 4, 2015. For purposes of the present summary judgment motion, the Court focuses on those facts relevant to Count VII, views the record in the light most favorable to Plaintiffs, and draws all reasonable inferences in their favor. *See Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009).

2

yelling, and gunshots—all within seconds. (*Id.* ¶ 22.) And King claims that she heard the dog's nails on the floor as the officers were coming into the residence. (*Id.* ¶ 25.) Neither the officers nor King and Henderson-Funchess heard the dog bark, growl, or snarl at any of the officers. (DRPASOF ¶ 3.)

The dog's name was Gucci King. (*Id.* ¶ 1.) According to Plaintiffs, he was a gentle and peaceful family dog known to the entire neighborhood. (*Id.*) Plaintiffs claim that Gucci King had no history of aggression and did not require a choke collar, as he was very obedient.[4] (*Id.*) When visitors entered the Drexel Residence, Gucci King would approach the front door to see who was arriving. (*Id.* ¶ 2.) And during a previous police raid at the Drexel Residence, Plaintiffs were permitted to place Gucci King in his cage before the search was conducted. (*Id.* ¶ 4.) The parties dispute whether Defendants knew about the presence of a dog at the Drexel Residence prior to entering it. (PRDSUF ¶ 8.)

According to Plaintiffs, after the officers entered the Drexel Residence, King and Henderson-Funchess were handcuffed, even though they were teenagers at that time and were not trying to attack or hurt the officers. (DRPASOF ¶¶ 14, 16; Ex. E to Defs.' Local Rule 56.1(a)(3) Stmt. of Material Facts at 6, Dkt. No. 52-6; Ex. F to Defs.' Local Rule 56.1(a)(3) Stmt. of Material Facts at 6, Dkt. No. 52-7.) While being handcuffed, Henderson-Funchess was subjected to offensive comments and also was pulled up and then slammed to the ground face-down (her lip split open when her face hit the floor). (DRPASOF ¶ 17.) She was also asked about her name and then threatened with harm to her family. (*Id.* ¶ 20.) Meanwhile, King was pulled upright by her hair, leaving a bald spot on her head. (*Id.* ¶ 18.). At some point during the raid, King and Henderson-Funchess both had guns pointed at them. (*Id.* ¶ 23.) For their part, Defendants deny

---

[4] Defendants do not contend that there is any evidence to the contrary—other than the incident at issue in the present case. (DRPASOF ¶ 1.)

placing King in handcuffs and assert that Henderson-Funchess was handcuffed due to being verbally combative. (*Id.* ¶¶ 14, 16.) Defendants also deny taking the other actions attributed to them in Plaintiffs' version of events, other than that Lee took down general demographic information for King and Henderson-Funchess. (*Id.* ¶¶ 17, 18, 20, 23.)

According to Plaintiffs, once handcuffed, King and Henderson-Funchess were seated on the couch in such a way that King could see Gucci King's dead body and called various offensive names. (*Id.* ¶¶ 19, 27.) King tried to talk to Papke about why he shot Gucci King, but Papke responded sarcastically, giving mocking commands to the dead dog and telling King to "go play with him." (*Id.* ¶¶ 24–26.) Defendants deny that any name-calling or mocking took place but admit that Papke might have spoken to King (although he cannot recall what was said between them). (*Id.* ¶¶ 19, 24, 25, 27.)

Plaintiffs assert that as a result of what happened during the raid, King and Henderson-Funchess suffered bruising on their wrists and Henderson-Funchess was taken to a hospital to receive treatment for her split lip. (*Id.* ¶¶ 28, 29.) Both of them reacted emotionally to the events with screaming and crying. (*Id.* ¶¶ 27, 30.) Henderson-Funchess was scared to leave home and missed school for a week; she was later treated by a psychiatrist due to the incident. (*Id.* ¶¶ 31, 32.) King also saw a counselor and was prescribed medication, but she claims that nothing helped "because Gucci [King] was not coming back." (*Id.* ¶¶ 34, 35.) In addition, according to Plaintiffs, the officers who raided the Drexel Residence left the home "torn up" and with several items missing. (*Id.* ¶¶ 36–39.)

In this lawsuit, Plaintiffs have brought the following claims against the police officer Defendants: claims for use of excessive force in violation of the Fourth Amendment to the United States Constitution by King against Schnier (Count I) and Henderson-Funchess against Lee

4

(Count III), claims for common law battery by King against Schnier (Count II) and Henderson-Funchess against Lee (Count IV), and claims for the unconstitutional seizure of Gucci King in violation of the Fourth Amendment by Anderson, Whitfield-Anderson,[5] both Whitfields, and King against Papke (Count VII). Plaintiffs have also named the City of Chicago as a Defendant in counts for indemnification (Count IX) and for *respondeat superior* responsibility (Count X). The present motion challenges the unconstitutional seizure claim only.

## DISCUSSION

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009). A genuine issue of material fact exists if a reasonable jury could find in favor of the nonmoving party. *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). In deciding a summary judgment motion, the court must consider the record as a whole, in the light most favorable to the non-moving party, and draw all reasonable inferences in favor of the non-moving party. *Bay v. Cassens Transp. Co.*, 212 F.3d 969, 972 (7th Cir. 2000).

It is well-established that police officers are entitled to qualified immunity from liability for civil damages under § 1983 unless the officers violated a federal statutory or constitutional right and their conduct's unlawfulness was clearly established at that time. *See D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officers from harassment, distraction, and liability when they perform their duties reasonably."

---

[5] Dorothy Whitfield-Anderson is James Anderson's wife, Terrell Whitfield and Toyothy Whitfield's mother, and Janice King's grandmother. (Ex. H to Defs.' Local Rule 56.1(a)(3) Stmt. of Material Facts at 6, 16, Dkt. No. 52-9.) Terrell Whitfield is Janice King's mother. (Ex. J to Pls.' Local Rule 56.1(a)(3) Additional Stmt. of Facts at 5, Dkt. No. 68-1.)

*Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *accord Green v. Newport*, 868 F.3d 629, 632–33 (7th Cir. 2017). Although qualified immunity is an affirmative defense, once a defendant evokes the doctrine, the plaintiff bears the burden of defeating it. *Purvis v. Oest*, 614 F.3d 713, 717 (7th Cir. 2010). To overcome qualified immunity, a plaintiff must demonstrate that (1) the facts, taken in the light most favorable to the plaintiff, show that the officers violated a constitutional right, and (2) the right was clearly established at the time of the conduct at issue. *Id.* at 720. In evaluating claims to qualified immunity, district courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

By no later than 2008, it was clearly established in this Circuit that the killing of a companion dog constitutes a "seizure" within the meaning of the Fourth Amendment. *See Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008). As a result, the use of deadly force against a dog is constitutional only if reasonable and, in turn, deadly force is reasonable for present purposes only if the dog poses an immediate danger and the use of force is unavoidable. *Id.*; *cf. Saathoff v. Davis*, 826 F.3d 925, 933 (7th Cir. 2016) (confirming that the test in *Viilo* applies when police officers shoot a dog at the owner's house while the owner is present, while also indicating that the test does not fit a situation involving a fight between two dogs).

Defendants contend that they are entitled to summary judgment on Plaintiffs' claim for the unconstitutional seizure of Gucci King for two reasons: (1) the shooting of the dog was reasonable, and (2) Papke is entitled to qualified immunity. While the two arguments allocate the burden of persuasion among the parties differently, the key issue is essentially same for both: whether Plaintiffs have adduced sufficient evidence from which a reasonable jury could find that

Papke's killing of Gucci King was unreasonable under the circumstances. *See Purvis*, 614 F.3d at 717. If the fatal shooting was indisputably reasonable, then Plaintiffs cannot prevail on the merits of the constitutional claim or the affirmative defense of qualified immunity.

But despite Defendants' assertion to the contrary, there are material factual disputes regarding whether Gucci King posed an imminent threat to the officers and whether Papke's use of force was unavoidable. As noted above, Papke claims that he saw Gucci King charging towards Schnier with his lips curled and teeth exposed. If a jury accepts that version of the facts, it may find that Papke's actions were reasonable. But the tactical response report regarding the incident does not mention Schnier. (PRDSUF ¶ 19; Ex. D to Defs.' Local Rule 56.1(a)(3) Stmt. of Material Facts at 107–08, Dkt. No. 52-5.) And neither the officers nor King or Henderson-Funchess heard Gucci King making any aggressive sounds. To the contrary, King reports only hearing Gucci King's nails against the floor. Moreover, Plaintiffs contend that Gucci King was a friendly family pet with no history of aggression, who simply liked to greet visitors to the home. Viewed in the light most favorable to Plaintiffs, a reasonable jury could conclude from that evidence that Gucci King was not acting in a threatening manner when the officers entered the Drexel Residence and did not pose an immediate danger. Even if Gucci King posed a potential danger to officers entering the Drexel Residence, a reasonable jury could conclude that the officers could have avoided the fatal use of force by, for example, allowing the dog to be secured by its owners (as was the case during a prior raid on the residence). Because there are disputed material facts regarding the reasonableness of the officers' conduct, summary judgment is not warranted on that basis. *Cf. Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 570 (6th Cir. 2016) (finding that the seizure of two dogs was reasonable because there was unrebutted

testimony that the dogs behaved in a manner threatening to officers' safety, including lunging and barking at the officers).

The factual dispute regarding the reasonableness of Papke's conduct prevents a determination that Defendants' conduct was reasonable and Plaintiffs' rights were not violated—and so Plaintiffs have satisfied the first requirement for defeating the qualified immunity defense. That leaves only the second requirement for the Court's consideration. In their initial and reply briefs in support of their motion, Defendants do not dispute that the second prong of the qualified immunity analysis—that the constitutional right was clearly established at the time of the conduct at issue—is met here. (*See* Defs.' Mem. in Supp. of Mot. for Summ. J. at 5–7, Dkt. No. 51; *see also* Defs.' Reply at 8, Dkt. No. 72.) Yet in their motion for leave to submit additional authority, which was filed after the scheduled briefing of the summary judgment motion was complete, Defendants suggest that the second prong is not satisfied. (*See* Defs.' Mot. for Leave ¶¶ 5–8, Dkt. No. 82.)

In particular, Defendants point to the recent Supreme Court decision in *Kisela v. Hughes*, 138 S. Ct. 1148 (2018). In *Kisela*, the Supreme Court reiterated that, while the qualified immunity doctrine does not require a case directly on point for a right to be considered clearly established, existing precedent must place the constitutional question beyond debate. *Id.* at 1152. In considering a qualified immunity defense, courts must not define what constitutes a clearly established right at a high level of generality—especially in the context of the Fourth Amendment, where it is sometimes difficult for an officer to determine how the relevant legal doctrine would apply to the factual situation at hand. *Id.* Thus, because the use of excessive force is an area of the law in which the outcome greatly depends on the facts of each case, officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts in the case. *Id.*

at 1153. "Where constitutional guidelines seem inapplicable or too remote, it does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness." *Id.*

Defendants contend that *Viilo* does not "squarely govern" the facts in the present case, as there is no evidence that this was a situation in which a dog clearly posed no immediate threat and was nonetheless killed while its owner looked on. Putting aside the fact that Defendants did not raise this argument until their motion for leave to submit additional authority, Defendants ignore what the facts, when viewed in the light most favorable to Plaintiffs, do show here. In *Viilo*, while the officers claimed that the dog was running with his teeth and gums exposed, multiple other witnesses testified that the dog was not interfering with the officers at all but instead was limping toward his owner when he was shot. *See Viilo*, 547 F.3d at 709–10. Likewise, while Papke has testified in this case that Gucci King charged towards him and Schnier with lips curled and teeth exposed, other evidence suggests that Gucci King was a friendly dog who was approaching the door with no signs of aggression when he was shot. In light of *Viilo*, shooting Gucci King in the latter scenario would violate a clearly established constitutional right.

## CONCLUSION

Accordingly, for the reasons discussed above, Defendants' motion for summary judgment (Dkt. No. 50) is DENIED.

ENTERED:

Dated: May 29, 2018

_____
Andrea R. Wood
United States District Judge